1

2

3

4                    UNITED STATES DISTRICT COURT

5                        DISTRICT OF NEVADA

6                                * * *

7    STACEY M. RICHARDS,                     Case No. 2:16-CV-1794 JCM (BNW)

8                          Plaintiff(s),                    ORDER

9          v.

10   GREG COX, et al.,

11                        Defendant(s).

12

13          Presently before the court is the matter of *Richards v. Cox et al.*, case number 2:16-cv-

14   01794-JCM-BNW.

15          On July 28, 2016, plaintiff Stacey Richards brought one claim[1] under 42 U.S.C. § 1983

16   ("Section 1983") against Nevada Department of Corrections ("NDOC") and Ely State Prison

17   ("ESP") employees James Cox, Renee Baker, William Gittere, Michael Fletcher, Michael Byrne,

18   and Eric Boardman.  (ECF No. 1).

19          On May 23, 2019, this court granted summary judgment in favor of defendants Gittere,

20   Fletcher, and Byrne, but denied summary judgment for defendants Cox, Baker, and Boardman

21   (the "remaining defendants").  The remaining defendants first moved this court to reconsider its

22   summary judgment decision (ECF No. 75), which this court denied (ECF No. 83), then appealed

23   this court's summary judgment and reconsideration orders (ECF No. 85).

24          In its memorandum and opinion, the Ninth Circuit remanded this matter, affirming in part

25   and vacating in part this court's holdings.   (ECF No. 87).   Specifically, the Ninth Circuit

26

27   _____

28          [1] As well as three state law claims which Richards consented to dismissing because the
     Eleventh Amendment precludes him from suing the State of Nevada, a prerequisite for his
     supplemental state law claims.  (ECF No. 73 at 5).

James C. Mahan
U.S. District Judge

1    affirmed this court's denial of summary judgment for defendants Cox and Baker but found that

2    this court erred in its analysis of whether "Boardman [is] entitled to qualified immunity from

3    Richards's Eighth Amendment [Section 1983] claim" and stopped too soon in determining

4    whether "Boardman's actions violated a clearly established right." (*Id.* at 7–9).

5            Pursuant to the Ninth Circuit's instruction, this order analyzes whether Boardman is

6    entitled to qualified immunity under a "malicious and sadistic" standard—instead of the

7    previously used "deliberate indifference" standard—and whether Boardman violated a clearly

8    established right by firing two live rounds in Richards's direction as Richards alleges. (*Id.*).

9    **I.     Background**

10           This matter arises out of a shooting incident that took place at ESP in Ely, Nevada, to

11   which Richards was an innocent bystander. (ECF No. 67).

12           On April 21, 2015, at about 7:15 p.m., Richards and approximately 25 inmates were

13   congregating on the lower tier of their unit during free time. (ECF No. 67 at 7). While the

14   inmates were congregating, prison correctional officers, including officer Boardman, and staff

15   were in the control room, known as "the bubble." (*Id.*).

16           Without warning, four inmates began attacking a fifth inmate, punching and kicking him.

17   (*Id.*). Richards was not involved in this altercation but was instead standing and talking to some

18   other inmates at a table adjacent to and behind the spot where the fight broke out. (*Id.*).

19           From the bubble, Boardman noticed the fight and yelled out to the inmates, "stop

20   fighting, get on the ground." (*Id.*). Inmates not involved in the fight, including Richards, began

21   to get on the floor, but the five inmates involved in the altercation continued fighting. (*Id.*).

22           The parties dispute what happened next. Boardman submits that, after he yelled for the

23   inmates to get on the ground, he fired a blank shotgun cartridge in compliance with NDOC

24   policy. (ECF No. 60 at 3). When two inmates continued fighting, Boardman alleges he again

25   verbally ordered all inmates to get on the ground, to no avail. (*Id.*).

26           Boardman alleges that he "then discharged the weapon with a live round of 7.5 birdshot,"

27   at the ground in the vicinity of the fighting inmates, which is known as a "skip shot." (*Id.*).

28   According to Boardman, the skip shot "was used in order to reduce the danger of engaging in

**James C. Mahan**
**U.S. District Judge**

1    this type of fight or disturbance control, as it ensured that the pellets would remain below the belt

2    line." (*Id.*). However, multiple pellets from the second shot struck Richards in the face,

3    permanently blinding him in his left eye, and causing him to lose nearly all vision in his right

4    eye. (ECF No. 67 at 10).

5         Richards disputes that Boardman ever fired a blank shotgun cartridge prior to shooting a

6    live round. (*Id.* at 7; *see* ECF No. 68 at 2–3). Richards asserts that when he heard the first

7    gunshot, he simultaneously felt several pellets hit his right shoulder. (ECF No. 67 at 7).

8         After feeling the first shot to his right shoulder, Richards "instinctively" raised his head

9    to look at his shoulder and stated to another inmate, "damn, I've been shot." (*Id.*). Moments

10   later, he felt a second blast hit his face. (*Id.*). According to Richards, blood poured out of both

11   his eye sockets, and everything went black. (*Id.*).

12   **II.    Legal Standard**

13        Summary judgment is proper when the record shows that "there is no genuine dispute

14   as to any material fact and the movant is entitled to a judgment as a matter of law."[2] FED. R.

15   CIV. P. 56(a). The purpose of summary judgment is "to isolate and dispose of factually

16   unsupported claims or defenses," *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986), and

17   to avoid unnecessary trials on undisputed facts. *Nw. Motorcycle Ass'n v. U.S. Dep't of*

18   *Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994).

19        When the moving party bears the burden of proof on a claim or defense, it must

20   produce evidence "which would entitle it to a directed verdict if the evidence went

21   uncontroverted at trial." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474,

22   480 (9th Cir. 2000) (internal citations omitted). In contrast, when the nonmoving party bears

23   the burden of proof on a claim or defense, the moving party must "either produce evidence

24   negating an essential element of the nonmoving party's claim or defense or show that the

25   _____

26        [2] The court can consider information in an inadmissible form at summary judgment if the
     information itself would be admissible at trial. *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir.
27   2003) (citing *Block v. City of Los Angeles*, 253 F.3d 410, 418–19 (9th Cir. 2001) ("To survive
     summary judgment, a party does not necessarily have to produce evidence in a form that would
28   be admissible at trial, as long as the party satisfies the requirements of Federal Rules of Civil
     Procedure 56.")).

James C. Mahan
U.S. District Judge

1  nonmoving party does not have enough evidence of an essential element to carry its ultimate

2  burden of [proof] at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102

3  (9th Cir. 2000).

4      If the moving party satisfies its initial burden, the burden then shifts to the party

5  opposing summary judgment to establish a genuine issue of material fact. *See Matsushita*

6  *Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). An issue is "genuine" if

7  there is an adequate evidentiary basis on which a reasonable factfinder could find for the

8  nonmoving party and a fact is "material" if it could affect the outcome under the governing

9  law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).

10      The opposing party does not have to conclusively establish an issue of material fact in

11  its favor. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.

12  1987). But it must go beyond the pleadings and designate "specific facts" in the evidentiary

13  record that show "there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. In other

14  words, the opposing party must show that a judge or jury must resolve the parties' differing

15  versions of the truth. *T.W. Elec. Serv.*, 809 F.2d at 630.

16      The court must view all facts and draw all inferences in the light most favorable to the

17  nonmoving party. *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 888 (1990); *Kaiser Cement*

18  *Corp. v. Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986). The court's role is

19  not to weigh the evidence but to determine whether a genuine dispute exists for trial.

20  *Anderson*, 477 U.S. at 249. The evidence of the nonmovant is "to be believed, and all

21  justifiable inferences are to be drawn in his favor." *Id.* at 255. But if the evidence of the

22  nonmoving party is merely colorable or is not significantly probative, summary judgment

23  may be granted. *See id.* at 249–50.

24  **III.   Discussion**

25      Section 1983 permits suits against government officials in their individual capacities

26  who, under color of law, violate individuals' constitutional rights. 42 U.S.C. § 1983. However,

27  some government officials are protected from Section 1983 suits based on a defense of qualified

28  immunity. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

James C. Mahan
U.S. District Judge

1    Qualified immunity involves a two-part inquiry at the summary judgment stage.  *See*

2  *Tolan v. Cotton*, 572 U.S. 650, 655–56 (2014).  First, the court determines whether, viewing the

3  facts in light most favorable to the non-moving party, a government official's conduct violated a

4  federal right.  *Id.*  In the Eighth Amendment context, this determination involves both a

5  subjective and objective inquiry: whether the official subjectively acted with a "sufficiently

6  culpable state of mind" and whether the alleged harm objectively was "sufficiently serious."  *See*

7  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal citation omitted).  Second, the court

8  determines whether that federal right "was clearly established at the time of the alleged

9  violation."  *Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 945 (9th Cir. 2017).  If the

10  answer to either question is "no," the official is entitled to qualified immunity.  *See id.* at 946

11    a.  <u>Boardman violated Richards's federal right to be free from excessive force used</u>
    <u>maliciously and sadistically to cause harm</u>

12    Per the Ninth Circuit's memorandum:

13    Determining whether Boardman violated Richards's Eighth Amendment
    right requires a subjective inquiry into whether Boardman acted with a

14    "sufficiently culpable state of mind."  [*Farmer v. Brennan*, 511 U.S. 825, 834
    (1994) (internal citation omitted)].  The requisite state of mind depends on the

15    nature of his actions as a prison official.  *See id.* at 835–36.  If an inmate
    challenges either a prison official's force as excessive or a prison official's actions

16    during a prison disturbance, the prison official must act "maliciously and
    sadistically" for the very purpose of causing harm.  *Hudson v. McMillian*, 503

17    U.S. 1, 6–7 (1992) (explaining that the "malicious and sadistic" standard, not the
    "deliberate indifference" standard, is appropriate when analyzing use of force

18    under the Eighth Amendment); *Jeffers v. Gomez*, 267 F.3d 895, 910–11, 913
    (explaining that a prison official's actions during an ongoing prison security

19    measure is governed by the "malicious and sadistic" standard).

20    (ECF No. 87 at 7–8).

21    To determine whether Boardman acted maliciously and sadistically, the court considers

22  five factors: 1) Boardman's need to apply force; 2) the extent of Richards's injuries; 3) the

23  relationship between Boardman's need for force and the amount of force he used; 4) the nature

24  of the threat perceived by Boardman; and 5) Boardman's efforts to temper the severity of his

25  forceful response. *Hudson*, 503 U.S. at 7.  The core inquiry centers around Boardman's intent—

26  whether he merely wanted to cause harm and had no other intent when deploying force, not

27

28

James C. Mahan
U.S. District Judge

- 5 -

1    whether he derived enjoyment or pleasure from his use of force.  *Hoard v. Hartman*, 904 F.3d

2    780, 788–89 (9th Cir. 2018).[3]

3          Because parties dispute whether Boardman fired a blank shot before a live round and

4    what direction he fired, the court views those disputed facts in the light most favorable to the

5    nonmovant, Richards, by assuming that two live rounds were fired and that the shots were aimed

6    towards Richards.  *See Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 888 (1990).

7                    i.  *Boardman faced a need to apply force*

8          Boardman faced a brawl involving four inmates attacking one inmate by punching and

9    kicking him.  While three of the aggressors complied with Boardman's verbal command to stop

10   fighting and get on the ground, two inmates continued fighting.  Thus, Boardman faced a need to

11   apply some force.

12                   ii.  *Richards's injuries are severe*

13         Richards suffered serious and permanent injuries including blindness in his left eye and

14   serious damage to his right eye.  (ECF No. 95 at 5).  Despite two initial surgeries, Richards

15   requires future treatments to replace the oil filling the globe of his eye.  (*Id.*).  Yet, even with

16   continued treatment, Richards is at risk of losing vision entirely if his right retina detaches.  (*Id.*).

17   Thus, Richards's injuries are severe.

18                  iii.  *The amount of force Boardman used exceeded his need for force based on the*
                          *nature of the threat he perceived*

19         The parties agree that, during the incident, Boardman's firing of the skip shot technically

20   complied with the NDOC policies and training regarding use of force in effect at the time of the

21   incident.  (*See* ECF Nos. 60 at 10; 67 at 2).  Specifically, Boardman acted pursuant to NDOC's

22   administrative regulation ("AR") 405.[4]  (*See* ECF No. 60-1).  Nevertheless, assuming all facts in

23   _____

24       [3] The "maliciously and sadistically" language serves a rhetorical function and does not
25   create additional elements.  *Id.*  Using these two terms together creates a higher level of intent
     than either would alone create.  *Howard*, 21 F.3d at 872.

26       [4] AR 405 provided that force must have been limited to the minimum degree necessary to
27   resolve a situation and that, when possible, verbal commands would be used prior to any use of
     force.  (ECF No. 60-1 at 3).  However, AR 405 specifically authorized the use of skip shots as a
     "non-deadly force" tactic to be used "as the situation dictate[d]."  (*Id.* at 3–4).  According to the
28   regulation, skip shots were designed to strike offenders "in their lower extremities to temporarily
     incapacitate or immobilize" them.  (*Id.* at 4).

James C. Mahan
U.S. District Judge                              - 6 -

the light most favorable to Richards, Boardman's firing of two live rounds directly in Richards's direction without first firing a blank warning shot is in excess of the force called for in this situation.

A live round carries significant risk of serious harm to inmates, and even birdshot in an enclosed space presents risk of injury to bystanders when nearly every surface is metal or concrete because it may ricochet. *See Perez v. Cox*, 788 Fed. Appx. 438, 443 (9th Cir. 2019).

While visible bleeding or the presence of weapons may have justified firing shots at involved inmates to prevent substantial bodily harm, Boardman perceived neither from the bubble. (*See generally* ECF Nos. 60, 71, 94, 96). After the altercation, prison officials reported finding no weapons and that the victim suffered only minor scratches and abrasions. (ECF No. 95 at 3). Thus, this altercation did not pose such grave or serious risk to warrant a live round, nor did it pose such a threat to warrant firing the shotgun towards inmates not involved in the altercation.

Even if the court reversed the summary judgment standard and viewed these facts in the light most favorable to the movant—assuming instead that Boardman fired a blank warning shot before the skip shot—there was still no justification for Boardman's level of force. The skip shot was[5] categorized as non-lethal force, in part, because it ensured that the pellets remained below inmates' belt level when fired. However, before firing the skip shot, Boardman commanded all inmates to get down on the ground. Boardman thus ordered the inmates to put their faces near where he was aiming his gun and fired his gun in that direction mere moments later.

In this situation, pellets ricocheting into Richards's head was so definite a probability of firing a skip shot in his direction that a reasonable jury could determine Boardman must have acted with the very purpose of causing harm, not to disperse the brawl as he claims.

   iv.  *Boardman did not temper the severity of his use of force*

Boardman did first issue one verbal command to the inmates—"stop fighting, get on the ground." When he issued that command, only two inmates refused to comply, neither of which

---

[5] Skip-shotting has reportedly been removed from NDOC policy, replaced by use of less lethal force like rubber bullets and tasers. (*See* ECF No. 72-2).

James C. Mahan
U.S. District Judge

1    were Richards.  Yet, Boardman fired two live rounds in Richards's direction moments later

2    without a warning shot.

3         Once the brawl was reduced to two non-compliant inmates, Boardman could have, and

4    should have, used minimal force instead of immediately firing upon the compliant inmates.  For

5    instance, Boardman should have pressed the alarm and monitored the situation to avoid

6    unnecessarily injuring the compliant inmates while maintaining his ability to fire a skip shot if

7    the violence escalated.

8

9         Further, according to Richards, Boardman fired the live round in Richards's direction

10   mere moments after issuing his verbal command.  Even if Boardman believed immediate

     separation of the two remaining inmates was necessary, he could have, and should have, fired a

11   warning shot or fired a skip shot away from the direction of the compliant inmates.  Thus,

12   Boardman did not temper his use of force.

13               v.   *Boardman acted maliciously and sadistically for the very purpose of causing*
                     *harm when he caused severe harm to Richards*
14

15        In summary, Boardman did not call for help or raise the alarm when the inmates began

16   fighting or at any point before firing his shotgun.  There was no excessively violent inmate

17   conduct or presence of weapons to justify the firing of live rounds in the direction of compliant

18   inmates.  Yet, Boardman fired a live round in Richards's direction while Richards was

19   complying with Boardman's order to get on the ground.  Upon being hit by the first shot,

20   Richards instinctively raised his head, at which point Boardman fired a second live round in

21   Richards's direction that struck Richards in the face, causing Richards permanent eye damage.

22        Thus, assuming all facts in the light most favorable to Richards, Richards shows that

23   Boardman subjectively intended with a malicious and sadistic purpose to cause harm for the very

24   purpose of causing harm, not to break up a brawl as Boardman contends.

25        Additionally, as discussed above, Richards's injuries are severe and debilitating.  *See*

26   *supra* Part III.A.2.  Therefore, objectively, the harm Boardman caused is sufficiently serious to

27   sustain Richards's Section 1983 claim at summary judgment.

28

**James C. Mahan**
**U.S. District Judge**

1  Accordingly, as Boardman subjectively acted with a sufficiently culpable state of mind

2  and caused harm that, objectively, is sufficiently serious, Boardman violated Richards's Eighth

3  Amendment federal right to be free from excessive force used maliciously and sadistically for

4  the purpose of causing harm.

5      b.  <u>The right to be free from excessive force used maliciously and sadistically for the</u>
<u>purpose of causing harm was clearly established at the time of the incident</u>

6  Qualified immunity insulates public officials "from liability for civil damages insofar as

7  their conduct does not violate clearly established constitutional rights of which a reasonable

8  person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v.*

9  *Fitzgerald*, 457 U.S. 800, 818 (1982)).   Qualified immunity is broad, protecting "all but the

10  plainly incompetent or those who knowingly violate the law." *Lee v. Gregory*, 363 F.3d 931,

11  934 (9th Cir. 2004) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

12  A right is clearly established if "it would be clear to a reasonable officer that his conduct

13  was unlawful in the situation he confronted." *Id.* at 1062 (quoting *Saucier v. Katz*, 533 U.S. 194,

14  202 (2001)).  In making this inquiry, the court should consider "the specific context of the case"

15  and not "broad general proposition[s]." *Saucier*, 533 U.S. at 201.  It is the plaintiff's burden to

16  show that the constitutional right was clearly established. *Sorrels v. McKee*, 290 F.3d 965, 969

17  (9th Cir. 2002).

18  It is clearly established that an inmate has a constitutional right to be free from excessive

19  force used maliciously and sadistically to cause harm.  *Hudson*, 503 U.S. at 7.  As discussed

20  above, viewing all facts in the light most favorable to Richards shows that Boardman's malicious

21  and sadistic conduct subjected Richards to excessive force without justification.

22  Further, *Robins v. Meecham*, 60 F.3d 1436 (9th Cir. 1995) clearly establishes that

23  Boardman violated that right by firing birdshot at Richards.  In *Robins*, a correctional officer

24  working at ESP intentionally fired a shotgun loaded with birdshot at an inmate who was not

25  complying with orders to lock up.  There, the Ninth Circuit determined that the firing of the

26  birdshot directly at the inmate to provoke compliance constituted intent to punish that inmate.

27  That intent and conduct also constituted a violation of another compliant inmate's Eight

28

James C. Mahan
U.S. District Judge

- 9 -

1    Amendment rights when the complaint inmate was injured by the pellets aimed at the first
2    inmate.
3            Boardman argues that *Robins* does not clearly establish that firing a shotgun blast at
4    inmates is unconstitutional *per se* because, in context, the *Robins* decision merely discusses
5    shotgun blasts as dicta because a shotgun was medium the officers used to cause harm in that
6    case.  (ECF No. 94 at 8).  To the contrary, the Ninth Circuit clearly established that firing a
7    shotgun blast at a momentarily non-compliant inmate does violate an inmate's Eighth
8    Amendment rights.  The discussion concerning the shotgun was in passing because the
9    unconstitutionality of firing live rounds at temporarily non-compliant inmates is so clear that in
10   depth discussion was not required.
11           The Ninth Circuit also recently disagreed with Boardman's interpretation of *Robins*.  In
12   *Perez v. Cox*, 788 F. App'x 438 (9th Cir. 2019), the Ninth Circuit held that *Robins* explained that
13   the "conduct at issue [firing birdshot as a skip shot at inmates] clearly implicated the Eighth
14   Amendment: 'Whom the prison officials shot, Robins or Echavarria, is not relevant—what is
15   relevant is that they fired a shotgun blast at an inmate. It is this conduct that the Eighth
16   Amendment is designed to restrain.'"  *Perez*, 788 F. App'x at 444 (quoting *Robins*, 60 F.3d at
17   1440)) (citations omitted).  While *Perez* was decided after this incident and was analyzed under
18   the motion to dismiss standard, its rationale supports this court's holding that Boardman's
19   conduct violated clearly established law under *Robins*.
20           Thus, viewing the facts in the light most favorable to Richards, Boardman is not entitled
21   to qualified immunity on Richards's Section 1983 claim.
22   **IV.    Conclusion**
23           Accordingly,
24           IT IS SO ORDERED, ADJUDGED, and DECREED that defendant Eric Boardman's
25   motion for summary judgment (ECF No. 60) be, and the same hereby is, DENIED.
26           DATED October 25, 2021.
27
28                                                        _____
                                                          UNITED STATES DISTRICT JUDGE

James C. Mahan
U.S. District Judge